Filed 6/14/24  In re L.V. CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re L.V., A.V., and B.V., Persons Coming Under the Juvenile Court Law. | |
| MENDOCINO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent, v. J.V., Defendant and Appellant. | A168327 (Mendocino County Super Ct. Nos. 22JV00005-01, 22JV00006-01, 22JV00007-01) |

J.V. (Mother) and S.V. (Father) are the parents of six children who were adjudged dependents of the juvenile court: L.V., born in 2006, A.V., born in 2008, B.V., born in 2010 or 2011, R.V., born in 2012, Z.V. born in 2018, and E.V., born in 2020.  At an 18-month review hearing, the juvenile court found that the three eldest children (L.V., A.V., and B.V.) were at substantial risk of detriment if returned to Mother's custody (Welf. & Inst. Code, § 366.22, subd. (a)(1)),[1] that the Mendocino County

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.  Mother's and Father's three youngest children (R.V., Z.V., and E.V.) are no longer subject to the juvenile court's

Department of Social Services (Department) had offered Mother reasonable reunification services (§ 366.22, subd. (a)(3)), and that her reunification services should be terminated. Mother appeals from those orders, challenging the juvenile court's visitation order, the sufficiency of the evidence to support the reasonable services findings, and compliance with the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; ICWA). We remand the matter for reconsideration of the visitation order and to ensure ICWA compliance but otherwise conditionally affirm.

## BACKGROUND

### A.

In February 2022, the juvenile court sustained dependency petitions on behalf of each of the six children, finding true allegations that they were at substantial risk of physical harm and serious emotional damage due to the parents' substance abuse, domestic violence, physical abuse, untreated mental health issues, and failure to provide medical treatment. (§ 300, subds. (b), (c).) The Indian Child Inquiry Attachment (Judicial Council Forms, form ICWA-010(A)) attached to the dependency petition indicated that L.V., B.V., and A.V. "may have Indian ancestry" based on Mother's statement that she has " '[h]eavy Native American ancestry' " but was not enrolled in any tribe.

The family originally came to the attention of the Department, in January 2022, on a report of neglect. When the investigating social worker responded to the rural property where the family was staying, she found broken-down vehicles, as well as piles of garbage, broken windows, sharp rusted metal objects, and hazardous chemicals strewn on the ground within reach of the children. The trailer Mother and her children were living in did not have running water, a toilet, or a septic system.

jurisdiction and have returned to Mother's sole custody. R.V., Z.V., E.V., and Father are not involved in the instant appeal.

2

Mother admitted inappropriately disciplining her children and engaging in significant physical violence with Father. The older children also reported that Mother and Father yelled and screamed, hit each other, and threw and broke things. If the older children tried to intervene, the parents would shove or strike them. Mother acknowledged the family had been homeless for six years and admitted she last used methamphetamine two weeks earlier (when they came to California from Tennessee). Father initially agreed to submit to a drug test, but after the social worker returned from retrieving the drug test kit from her car, Father had left the property.

As a result of his parents' domestic violence, L.V. had observed black eyes, raised red welts, and blood on Mother. He had observed scratches on Father. All three older children told the social worker that they felt unsafe in their parents' care. L.V. suffers anxiety and regular nausea, A.V. suffers suicidal thoughts and anxiety, and B.V. exhibits aggressive behaviors (such as punching his family members) when frustrated or disappointed. The oldest two children (L.V. and A.V.) took care of the younger siblings and said they did not have enough food. L.V. and the other children had not been in school for four years because Mother would not allow it. He could not remember the last time he (or any of the other children) saw a doctor or dentist, but it was more than four years ago. He had at least one broken tooth that hurt.

The children were detained and placed in different foster care placements. At the detention hearing, Mother indicated that she possibly has Choctaw, Chippewa, or Cherokee ancestry, but that she was not enrolled in any tribe and that her grandmother and other relatives with knowledge of this ancestry were now deceased. The juvenile court ordered a minimum of two hours of weekly (supervised) visitation between the children and their parents and, on the Department's and minors' counsel's request,

3

agreed that the older children's parental "visitation [was] not to be forced." The juvenile court also indicated that further ICWA inquiry (and possibly notice to the identified tribes) would be needed.

## B.

The Department's jurisdiction report noted that B.V. and R.V. had attended an initial visit with Mother (along with E.V. and Z.V.) but that B.V. left early. Since then, both B.V. and R.V. refused to visit with either parent. L.V. and A.V. had also declined all possible parental visitation and only attended sibling visits. Mother had begun accessing services, was testing negative and cooperating with the social worker. She had moved away from Father and expressed some understanding of her older children's feelings. All four school aged children were now enrolled and happy to be attending school.

Mother submitted a Parental Notification of Indian Status form (Judicial Council Forms, form ICWA-020), which stated that one of her ancestors is or was a member of a federally recognized tribe and that her children may be members of, or eligible for membership in, the Cherokee, Chippewa, or Choctaw tribes. In the jurisdiction report, the social worker noted there was reason to believe the children may be Indian children.

## C.

By the time it filed its disposition report, in February of 2022, the Department had transferred the case to a new social worker and was requesting a finding that ICWA did not apply. On the latter point, the report notes that an assistant social worker had discussed Native American heritage with L.V., who said, " 'my mom said her grandmother or something was full Cherokee.' " Mother had also recently completed a family tree and stated that her paternal grandmother might have been enrolled in an unknown tribe. Mother's paternal uncle had also

4

been interviewed. He said that his mother was not a member of any tribe, but " 'if you saw a picture of my grandmother (his mother's mother), you would think that she was Native American.' " Based on the information obtained from both Mother and her paternal uncle, the assistant social worker conducted research on ancestry.com, but could not determine whether the children are connected to any Native American tribe.

Mother told the new social worker that she was no longer in a relationship with Father. She had moved into a shelter for domestic violence victims, was participating in the "Alternatives to Violence" program, and was engaged in therapy.

L.V., A.V., and B.V. all had initial assessments for therapeutic services. B.V.'s treatment was aimed at reducing symptoms and impairments of post-traumatic stress disorder. A.V.'s treatment goals involved addressing his anxiety and past suicidal ideation. L.V. reported feeling alone and depressed. Although R.V. had recently agreed to monthly parental visits, L.V., A.V., and B.V. continued to refuse.

At the disposition hearing, minors' counsel stated L.V., A.V., and B.V. were very angry and were adamant that they could not live with or be forced to visit either parent. The juvenile court found that ICWA did not apply, adjudged each child to be a dependent child and ordered them removed from parental custody with reunification services.

The juvenile court also adopted the Department's case plan, which required Mother to engage in (1) parenting classes; (2) individual therapy; (3) domestic violence counseling; and (4) drug testing and substance abuse treatment. She was also required to obtain suitable housing and meet her children's medical and dentals needs. The case plan directed Mother to have supervised visits with the children for a minimum of three hours weekly, but visitation was not to be forced. In making this order, the court observed the children had been heavily traumatized, which would

not be quickly resolved. While the children were given space to heal, the court asked the parents to consider writing letters.

The case plans for L.V., A.V., and B.V. required support of their family relationship through court ordered visitation but did not mandate therapy. Mother unsuccessfully requested family therapy be added to the case plan. Mother did not appeal from the dispositional findings and orders.

## D.

The Department's six-month review report indicated Mother had obtained suitable housing, was employed, was participating in a domestic violence program, and was fully engaged in individual therapy. She now recognized the damage domestic violence had imposed on her children. She was regularly drug testing negative.

Mother's visits with the three youngest children were consistent and she was observed to be loving and appropriate. Due to her stability in recovery, behavioral changes, and consistent engagement in services, the Department recommended that R.V. be placed in her care with family maintenance services. The Department anticipated that E.V. and Z.V. would follow shortly.

In his ongoing therapy, B.V. was openly angry about the trauma suffered in his parents' care. He was having nightmares. A.V. had voluntarily ended his therapy, after two months, but knew he could resume therapy by contacting his social worker or therapist. L.V. was doing well in high school. He was on a waitlist for therapy, but the social worker made a new referral so that he could start therapy sooner.

The social worker encouraged all three of the oldest children to visit Mother and told them about Mother's participation in services. However, the three eldest children still refused and were adamant that they would not change their

6

minds. The social worker continued to request that visits not be forced. Because all three of the eldest children continued to indicate they were unwilling to live with their parents or even visit, the Department recommended continuing their placement in foster care and Mother's reunification services.

In an addendum report, the Department noted that L.V. would be assigned to a therapist soon. However, B.V. had recently ended his therapy.

At the six-month review hearing, the juvenile court found Mother made "significant progress" and ordered R.V. into a family maintenance plan while continuing the out of home placements for the other children and providing Mother with an additional six months of reunification services. The court found that visitation with Mother would not be detrimental to L.V., A.V., and B.V. but stated that "[v]isits are not to be forced."

Mother's counsel expressed concern about the fact that the eldest children were still refusing contact but did not object or ask for any changes to be made to the case plan, the proposed findings and orders, or the visitation language.

### E.

The Department's 12-month review report indicated that Mother had maintained her sobriety; graduated from a substance use disorder treatment program; complied with drug testing; remained in stable housing; enrolled in a parenting class; and recently "graduated" from individual domestic violence therapy. Mother continued to see a second therapist, who reported she was "engaged" but " 'struggling being away from her older kids.' " Mother was also provided with a cell phone, phone cards, and food vouchers.

L.V. was excelling in high school and engaged in therapy. B.V. had recently reengaged in therapy and verbalized he did not trust his parents. When they both attended his little brother's

7

birthday party, B.V. ignored his Mother. A.V. had several behavioral incidents during the prior six-month period that were concerning, but he assured social workers that he was not currently self-harming or experiencing suicidal ideation. A.V. continued to refuse therapy and the Department believed it could only encourage his participation. A.V. still refused to visit with Mother but was aware that he could change his mind about visitation and communicate his desire to see Mother to the social worker.

The Department recommended terminating Father's reunification services due to his failure to make substantial progress in mitigating the issues underlying the dependency. Although Mother had made "exceptional" progress, made positive behavioral changes, and now reunified with her three youngest children, the three eldest minors continued to refuse her visits and were adamant that they did not want to live with her. Due to their steadfast refusal to visit Mother, the Department believed the probability of B.V., A.V., and L.V. returning to her care was low. Nonetheless, the Department felt an additional six months of services would be helpful given Mother's substantial progress and because alternative plans for the three eldest minors had not solidified.

At the 12-month review hearing, the juvenile court terminated Father's reunification services. The court found Mother had made "significant" progress and followed the Department's recommendation to order continued out of home placement for L.V., A.V., and B.V., and reunification services for an additional six months. The court adopted the Department's recommended visitation order—providing Mother with a minimum of one-hour supervised visits every week but also noting that visits not be forced. At no time during this hearing did Mother's counsel object to the proposed reasonable services

finding or the proposed visitation order. Nor did she ask to alter or amend the proposed case plan.

## F.

Ultimately, the Department recommended terminating Mother's reunification services in its 18-month review report. Mother continued to maintain her sobriety and strong commitment to improving herself. She remained engaged in therapy and joined a woman's empowerment group. B.V., A.V., and L.V. continued to do well academically and in their placements. As they had done throughout the entirety of the case, B.V., A.V., and L.V. had refused all visits with Mother since the 12-month hearing and continued to reject reunification. The Department believed it would be detrimental to their emotional well-being to be forced to live with Mother.

Acknowledging Mother's progress and ability to safely care for her three youngest children, the Department recommended dismissal of the dependency as to E.V., Z.V., and R.V., and that she be awarded sole physical and legal custody. The Department reported that placement of B.V., A.V., and L.V. in foster care remained necessary as they did not want to reunify, adoption was inappropriate, and legal guardians were not yet available.

## G.

At the 18-month review hearing, Mother's counsel objected to the Department's recommendation with respect to L.V., A.V., and B.V. She argued that reasonable services had not been provided and should, accordingly, be extended an additional six months. She also argued, for the first time, that the not-to-be-forced visitation order was an unconstitutional delegation of the court's power.

Mother's counsel made an offer of proof that Mother would testify she had, since the minors were detained, repeatedly requested child therapy, family therapy, zoom visits, phone calls,

9

in-person visitation, and letters, but that these services had not been provided because the Department believed forcing anything would prove counterproductive. Mother would also testify that she saw A.V., B.V., and L.V. when they arrived for a sibling visit the day before and A.V. responded to a compliment she gave by looking down and "kind of grin[ning]." When L.V. and B.V. walked up, neither of them engaged with Mother, but they did not appear afraid.

County counsel made an offer of proof that the social worker would testify the Department exceeded the minimum ordered sibling visitation and had offered L.V., B.V., and A.V. the opportunity to visit the younger minors in Mother's home, which the eldest children declined. The social worker had not been present when A.V. encountered Mother the day before, but B.V. later asked, " '[w]hy is my mother here?' "

Minors' counsel supported the Department's recommendation to terminate reunification services and to find reasonable services were provided. Minors' counsel noted that she could not "say enough" about how much work the social worker had done on visitation and that it was a "constant discussion point." Minors' counsel was adamant that L.V., A.V., and B.V. were "not ready," and that parental visitation was "just not going to happen" in the time available. There was nothing the Department could have done that they "haven't already done."

The juvenile court found Mother "substantial[ly]" met her case plan objectives but that return of L.V., A.V., and B.V. to Mother's custody would be detrimental to their psychological or emotional well-being because they had been "extremely traumatized" in the family home. The juvenile court found that the Department provided reasonable reunification services and that no exceptional circumstances justified further services. The court conceded Mother had done a "stellar job" in complying with

10

her case plan, but noted the minors had been offered therapy, and had a social worker who urged visitation. The court stated there was simply nothing else to be done about visitation absent use of physical force. The court assumed it had authority to extend services to 24 months, either under section 366.22, subdivision (b), or section 352, but stated it would not do so because "it would be detrimental to [the three eldest children's] emotional wellbeing."

With respect to the three youngest children, the juvenile court dismissed the dependency and granted Mother sole custody. With respect to the three eldest, the court terminated reunification services but did not set a section 366.26 hearing. The court did not find visitation between Mother and her three eldest children would be detrimental. The court ordered supervised visits with Mother on a minimum one-hour weekly schedule but also ordered that the children "shall not be forced" to visit.

**DISCUSSION**

**A.**

Mother maintains, and the Department concedes, that the juvenile court, at the 18-month hearing, impermissibly delegated (to L.V., A.V., and B.V.) its judicial authority to decide whether visitation with Mother should occur. Mother makes a related argument challenging the sufficiency of the evidence supporting the court's final reasonable services finding. She contends the Department did not do enough, in the six months preceding the 18-month hearing, to facilitate visitation. Assuming reasonable services were not provided, Mother insists that the court abused its discretion in not extending reunification services pursuant to section 352. Apart from the conceded claim regarding the final visitation order, Mother's claims lack merit.

**1.**

The fundamental purpose of dependency law is to protect the welfare and best interests of children who are at risk of being neglected, or physically, sexually, or emotionally abused. (§ 300.2, subd. (a); *Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 623 (*Michael G.*).) "[O]nce dependency jurisdiction is acquired because of the custodial parent's conduct, the court's inquiry shifts to a focus on the child's best interests, albeit with a preference towards parental reunification." (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1425.)

Visitation is a critical component of a reunification plan. (*In re Luke L.* (1996) 44 Cal.App.4th 670, 679.) "Without visitation of some sort, it is virtually impossible for a parent to achieve reunification." (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1491–1492.) The power to determine the right and extent of a parent's visitation in a dependency case resides with the court and may not be delegated to other parties. (*In re Donnovan J.* (1997) 58 Cal.App.4th 1474, 1476.) The court may delegate the responsibility for managing the details of visits, including their time, place, and manner (*In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1374), so long as "the ultimate supervision and control over this discretion" remains with the court. (*In re Julie M.* (1999) 69 Cal.App.4th 41, 51 (*Julie M.*).)

Although a dependent child's desires regarding visitation may be a dominant factor, visitation may not be dictated solely by the child. (*In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1138; *Julie M., supra*, 69 Cal.App.4th at pp. 48-51.) Because the court must focus on the child's best interests and eliminating the conditions leading to its jurisdiction, visitation may be denied if it threatens the child's physical or emotional well-being. (*In re Matthew C.* (2017) 9 Cal.App.5th 1090, 1101-1104; *Julie M.,* at p. 50.)

"To balance the interest in family preservation with the child's interest in the prompt resolution of her custody status and long-term placement, the dependency law establishes a detailed timeline for reunification. . . . Parents of children three or older are presumptively eligible for at least 12 months of services. ([§ 361.5], subd. (a)(1)(A).)  Reunification services are ordinarily provided for a maximum of 18 months after a child has been removed from parental custody."  (*Michael G., supra,* 14 Cal.5th at p. 625.)  At the six- and 12-month review hearings, if the dependent child is not returned to their parent's custody, the juvenile court is required to consider whether reasonable services—designed to aid the parent in overcoming the underlying problems—have been provided and, if not, extend reunification services for another six months.  (§ 366.21, subds. (e), (g); *Michael G.,* at p. 625.)

However, the statute governing the 18-month review hearing is different.  (§ 366.22, subd. (a); *Michael G., supra,* 14 Cal.5th at p. 626.)  Section 366.22, subdivision (a)(3), provides that if the child cannot be returned to the parents at the 18-month review hearing, the court *shall* order a section 366.26 hearing—regardless of whether reasonable reunification services have been provided—except in certain limited circumstances.  (*Michael G.,* at p. 628.)  If the court finds the child should not be returned to the parent or legal guardian, it must schedule a hearing to select a permanent plan under section 366.26 unless "the court finds by clear and convincing evidence . . . that there is a compelling reason . . . for determining that a hearing held under Section 366.26 is not in the best interests of the child because the child is not a proper subject for adoption and has no one willing to accept legal guardianship as of the hearing date."  (§ 366.22, subd. (a)(3).)  "The court shall also order termination of reunification services to the parent," "shall continue to permit the parent . . . to visit the child unless it finds that visitation would be detrimental," and "shall determine by clear and convincing

13

evidence whether reasonable services have been offered or provided to the parent." (*Ibid*.)

The juvenile court *may* extend services beyond the 18-month review hearing for three narrowly defined categories of parents who have faced specified obstacles to reunification *if* the court "determines by clear and convincing evidence that the best interests of the child would be met by the provision of additional reunification services." (§ 366.22, subd. (b)(1); accord, *Michael G., supra,* 14 Cal.5th at p. 628.) In addition, "California courts have also long recognized an ' "emergency escape valve" ' under section 352, . . . [which] is available to all parents in exceptional situations in which the court determines that extending services and continuing reunification efforts beyond 18 months is not contrary to the child's interests." (*Michael G.,* at p. 632.)

**2.**

Turning first to the visitation order entered at the 18-month review, we accept the Department's concession that the juvenile court erred by giving L.V., A.V., and B.V. an effective veto power over future visits. (See *In re S.H.* (2003) 111 Cal.App.4th 310, 317-318; *Julie M., supra*, 69 Cal.App.4th at pp. 48-52; but see *In re Danielle W.* (1989) 207 Cal.App.3d 1227, 1233, 1237-1239.) Accordingly, we will remand so that the juvenile court may consider whether to make a finding that visitation would be detrimental and, if it does not, to fashion an appropriate order that permits input from the children, but which recognizes that "ultimate supervision and control . . . must remain with the court." (*Julie M.,* at p. 51.)

**3.**

In her challenge to the reasonable services finding, Mother maintains that the Department did not do enough to facilitate visitation in the face of the older children's resistance. She recognizes that the social worker had repeatedly encouraged the

14

three oldest children to visit in the first 12 months.  But she argues that the Department was required to make new efforts because, once the 12-month mark passed without any visitation, it should have realized that its previous efforts to facilitate visitation had failed.  We conclude that any error was harmless.

"[T]o make the requisite findings, the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult (such as helping to provide transportation and offering more intensive rehabilitation services where others have failed)."  (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414, italics omitted.)  "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances."  (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)  "[A parent's] difficulty meeting the case plan's requirements does not excuse the agency from continuing its effort to bring [the parent] into compliance with the court's orders."  (*In re Taylor J.* (2014) 223 Cal.App.4th 1446, 1451.)

Our review is limited to the period following the 12-month review hearing because the juvenile court's preceding reasonable services findings (made at the six- and 12-month reviews) went unchallenged and are now final and binding.  (See *Serena M. v. Superior Court* (2020) 52 Cal.App.5th 659, 675.)  We review the juvenile court's finding at the 18-month hearing for substantial evidence, bearing in mind the clear and convincing evidence burden of proof.  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996; *T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1238, disapproved on other grounds by *Michael G., supra*, 14 Cal.5th at p. 631, fn. 8.)

15

Mother argues the Department failed to provide reasonable services because it did not do more to facilitate individual or family therapy for the oldest children (L.V., B.V., and A.V.). Here, neither family therapy nor individual child therapy was ordered as part of the case plan. To the extent Mother is belatedly challenging the adequacy of the reunification plan itself, including the juvenile court's visitation orders made at any hearing *before* the 18-month review, she has forfeited her right to raise such arguments on appeal by failing to appeal from the dispositional and intervening appealable orders. (See *Julie M., supra,* 69 Cal.App.4th at p. 47 [parent's failure to challenge service plan requirements, either by direct appeal from dispositional order or by filing petition to modify (§ 388), operates as acquiescence]; *Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 811 [parent challenging most recent order cannot challenge prior appealable orders for which statutory time to appeal has passed].)[2] Whether the department made reasonable efforts to implement and facilitate the approved plan, however, remains an ongoing issue that must be addressed by the juvenile court at each review hearing. (See *Julie M.,* at pp. 47-48.)

Here, the Department recognized early on that healing the interfamilial trauma would be key to reunification. Despite the social worker's previous efforts at encouraging all three of the older children to engage (or reengage) in individual therapy and to visit with Mother, the 18-month review report indicates that, during the relevant six-month period, L.V., B.V., and A.V. persisted in adamantly opposing visitation or reunification with Mother. True, the 18-month report does not detail any new efforts the social worker made to encourage the children to engage in visitation or therapy. But the Department made an

_____

[2] In her reply brief, Mother clarifies that she is "*not* complain[ing] that the order made at the time of the 12-month review, that visits were not to be forced, constituted an unlawful delegation." (Italics added.)

16

offer of proof at the 18-month hearing that the social worker proposed holding sibling visitation, which had gone well, in Mother's home. This offer of proof was received without objection.

It might not seem like much. And the social worker's apparent final effort to establish comfort and induce contact with Mother was unsuccessful. But this effort to facilitate visits came long after the Department referred L.V., A.V., and B.V. to individual therapy (before the disposition hearing), repeatedly encouraged them to visit, and made them aware of Mother's progress and change.

We are mindful that Mother's three older children are all teenagers and were (understandably due to their age) the most traumatized by the significant and long-term abuse and neglect in the family home. Thus, we cannot say it was unreasonable for the Department to decide that doing anything more would both further traumatize the older children and be unlikely to improve the situation. (See *In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356 [" 'child's input and refusal and the possible adverse consequences if a visit is forced against the child's will are factors to be considered in administering visitation' "]; *Julie M., supra*, 69 Cal.App.4th at pp. 47-48, 51.) Although Mother's progress is commendable, the record suggests there was simply nothing more that could be done in the face of the older children's strong resistance to visitation and reunification. On this record, a reasonable fact finder could find it highly probable that the Department provided reasonable services.

But even if we assume the trial court's finding is not supported by substantial evidence, Mother cannot demonstrate prejudice. Mother previously received 12 months of services—for which the reasonable services findings are now final. (See *Serena M. v. Superior Court, supra,* 52 Cal.App.5th at p. 675.) Regardless of whether reasonable reunification services were

17

provided in the most recent (12- to 18-month) period, she would not be entitled to an additional six months of reunification services, as she suggests, because "the statutory provision governing the 18-month hearing contains no provision requiring the court to extend services if it concludes that reasonable services have not been offered or provided." (See *Michael G., supra*, 14 Cal.5th at p. 628.)

The narrow exception to that rule—giving the juvenile court discretion to order 24 months of services—does not apply because Mother was not in a residential substance abuse treatment program, she was not a minor or nonminor dependent at detention, and she had not been recently incarcerated or institutionalized. (§ 366.22, subd. (b); *Michael G., supra,* 14 Cal.5th at p. 628.) Furthermore, the juvenile court expressly found it would not be in L.V.'s, B.V.'s, or A.V.'s best interests to provide additional reunification services. And Mother forfeited any challenge to this finding by failing to press it in her opening brief on appeal. (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 56.)

The unchallenged best interests finding is fatal both to Mother's eligibility for continued services under section 366.22, subdivision (b) (*Michael G., supra*, 14 Cal.5th at pp. 628-629), and to her argument that the juvenile court abused its discretion by declining to order continued services under section 352. (*Michael G.,* at p. 632.)

## B.

Finally, the parties agree that the juvenile court erred in finding ICWA does not apply without fulfilling its duty (and requiring the Department to fulfill its own duty) to inquire into the children's possible Native American lineage.

ICWA establishes minimum standards for courts to follow before removing Indian children from their families and placing

18

them in foster care or adoptive homes.  (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048 (*D.S.*).)  Under California's implementing legislation and rules of court, the juvenile court and the child welfare agency have "an affirmative and continuing duty to inquire" of all involved persons whether a child for whom a dependency petition has been filed is or may be an Indian child. (§ 224.2, subds. (a), (b); Cal. Rules of Court, rule 5.481(a); *D.S.,* at p. 1052.)  This duty "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, *extended family members*, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." (§ 224.2, subd. (b), italics added; accord, Cal. Rules of Court, rule 5.481(a)(1).)

California law also imposes on the court and social worker a duty to make "further inquiry" regarding the possible Indian status of a child if there is "reason to believe that an Indian child is involved in a [dependency] proceeding." (§ 224.2, subd. (e); *D.S., supra*, 46 Cal.App.5th at p. 1052.)  A "reason to believe" exists if the agency or the juvenile court "has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe." (§ 224.2, subd. (e)(1).)  "[F]urther inquiry" includes, but is not limited to, interviewing " 'extended family members,' " contacting the Bureau of Indian Affairs, and contacting "the tribes and any other person who reasonably can be expected to have information regarding the child's membership status or eligibility." (Cal. Rules of Court, rule 5.481(a)(4).)

The Department concedes it violated its duties of initial and further inquiry by failing to ask the Bureau of Indian Affairs, the State Department of Social Services, the three tribes identified by Mother, or Mother's second cousin (Emily)—who the original social worker contacted in early January 2022—about

the children's possible Native American ancestry.  (§ 224.2, subds. (b), (e); Cal. Rules of Court, rule 5.481(a)(4).)

The appellate courts are presently divided on what showing of prejudice warrants reversal for ICWA inquiry errors.  (See *In re E.C.* (2022) 85 Cal.App.5th 123, 152-155; *In re A.R.* (2022) 77 Cal.App.5th 197, 205-208; *In re Antonio R.* (2022) 76 Cal.App.5th 421, 433-435.)  That issue is currently pending before our Supreme Court.  (See *In re Dezi C.* (2022) 79 Cal.App.5th 769, review granted Sept. 21, 2022, S275578.)  We need not resolve this issue because the Department agrees with Mother that remand for ICWA compliance is required.

## DISPOSITION

The orders terminating Mother's reunification services are reversed only to the extent the orders provide for visitation with Mother that "shall not be forced."  In all other respects, the challenged findings and orders are conditionally affirmed.  The matter is remanded to the juvenile court for the limited purposes of (1) ensuring compliance with the inquiry provisions of section 224.2 and, if necessary, the notice provisions of section 224.3; and (2) reconsidering the visitation orders.  The juvenile court shall order that within 30 days of the issuance of the remittitur, the Department complete an inquiry investigation into the children's Indian ancestry.  If, on remand, the juvenile court determines that ICWA does not apply, the challenged orders (excepting the challenged visitation order) and ICWA inapplicability findings shall remain in effect.  If the court determines ICWA applies, it shall vacate the challenged orders and ICWA inapplicability findings and proceed in accordance with ICWA, related state law, and this opinion.

20

BURNS, J.

WE CONCUR:


JACKSON, P. J.
CHOU, J.

*In re L.V., A.V., and B.V. / Mendocino County Department of Social Services v. J.V.
(A168327)*

21